UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

WILLIAM F. HOWELL,

                Plaintiff,

-vs-                                              Case No. 6:04-cv-997-Orl-JGG

JO ANNE B. BARNHART,
Commissioner of Social Security,

                Defendant.
_____/

## MEMORANDUM OF DECISION

Plaintiff William H. Howell ["Howell"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying his application for a period of disability and disability insurance benefits. *See* Docket No. 1 (complaint). For the reasons set forth below, the Commissioner's decision is **REMANDED.**

I.    **PROCEDURAL HISTORY**

On January 3, 2002, plaintiff Howell filed an application for a period of disability and disability insurance benefits, claiming disability as of March 1, 2001. R. 51 - 53. On November 19, 2002, the Honorable David G. Danziger, Administrative Law Judge ["ALJ"], held a 75-minute hearing on Howell's claim in Orlando, Florida. R. 215 - 256. Non-attorney Robert Hicks represented Howell at the hearing. R. 12. The ALJ heard testimony by Howell, his brother, Ronald, and a vocational expert, June Beougher ["VE"].

On January 9, 2003, the ALJ issued a partially favorable decision.  R. 16.  The ALJ found that Howell had not engaged in substantial gainful activity since his alleged onset date, March 1, 2001.  R. 15, Finding 1.  Following a review of the medical and other record evidence, the ALJ found that from March 1, 2001 through February 7, 2002, Howell retained the residual functional capacity to perform the full range of the physical exertional requirements of light work, and to perform his past relevant work as a graphic designer.  R. 12, 15, Finding 5 - 6.  The ALJ found that as of February 8, 2002, Howell could not perform his past relevant work or any other work.  R. 12 and 15, Finding 7.  The ALJ applied the Medical-Vocational Guidelines and concluded that Howell was disabled as of February 8, 2002, but not prior to that date.  R. 15, Finding 7 - 8.

On May 12, 2004, after considering additional argument from Howell's representative but no additional medical evidence, the Appeals Council denied review.  R. 3 - 6.  On July 1, 2004, Howell timely appealed the Appeals Council's decision to deny review to the United States District Court.  Docket No. 1.  On December 2, 2004, Howell filed a memorandum of law in support of his appeal of the denial of review.  Docket No. 14.  On January 31, 2005, the Commissioner filed a memorandum in support of her decision that Howell was not disabled.  Docket No. 16.  The appeal is ripe for determination.

## II.   THE PARTIES' POSITIONS

Howell assigns three errors to the Commissioner.  First, he claims that the Commissioner erred in finding that he was not disabled prior to February 8, 2002 because the medical records do not support such a finding.  Second, Howell contends that the ALJ does not explain his selection of the onset date of February 8, 2002, and that the date is not supported by substantial evidence.

-2-

Finally, Howell claims that the Commissioner erred by failing to give substantial weight to the testimony of his treating physician.

The Commissioner responds that substantial evidence supports her decision to deny disability. The Commissioner argues that the record does not show that Howell's blood pressure, diabetes, vertigo and other ailments reached a disabling level of severity prior to February 8, 2002. The Commissioner also argues that the ALJ did in fact give substantial weight to the opinion of Howell's treating physician, but that the physician's opinion falls short of supporting Howell's contention that he had become disabled prior to February 8, 2002.

## III.    THE STANDARD OF REVIEW

### A.    Affirmance

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405 (g). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th

Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

### B.    Reversal and Remand

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405 (g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner, and order an award of disability benefits, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).

The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996). To remand under sentence four, the district court must either find that the Commissioner's decision is not supported

-4-

by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405 (g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405 (g).  To remand under sentence six, the claimant must establish:  1.) that there is

new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that

there is a reasonable possibility that it would change the administrative result; and 3.) there is good

cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 -

92;  *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547,

1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also Keeton v.

Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the

Commissioner if new, material evidence becomes available to the claimant.  *Jackson*, 99 F.3d at

1095.  With a sentence-six remand, the parties must return to the district court after remand to file

modified findings of fact.  *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending

remand, and does not enter a final judgment until after the completion of remand proceedings.[1]  *Id.*

## IV.    THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than twelve

months.  42 U.S.C. §§ 416 (i), 423 (d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe,

---

[1]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six.  *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text.  In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction.  *Id.*  In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court.  *Id.*

making the claimant unable to do his or her previous work, or any other substantial gainful activity

which exists in the national economy.  42 U.S.C. § 423 (d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

### A.    Treating Physicians

Substantial weight must be given to the opinion, diagnosis and medical evidence of a

treating physician unless there is good cause to do otherwise.  *See Lewis v. Callahan*, 125 F.3d

1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991);

*Sabo v. Commissioner of Social Security*,  955 F.Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. §

404.1527 (d).  If a treating physician's opinion on the nature and severity of a claimant's

impairments is well-supported by medically acceptable clinical and laboratory diagnostic

techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must

give it controlling weight.  20 C.F.R. § 404.1527 (d)(2).  The ALJ may discount a treating

physician's opinion or report regarding an inability to work if it is unsupported by objective

medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted

treating physician's report where the physician was unsure of the accuracy of his findings and

statements).

Where a treating physician has merely made conclusory statements, the ALJ may afford

them such weight as is supported by clinical or laboratory findings and other consistent evidence

of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see

also Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion

does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based

on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and

extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527 (d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527 (e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the providence of the Commissioner. 20 C.F.R. § 404.1527 (e).

### B. Developing the Record

The ALJ has a duty to fully and fairly develop the record. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981). The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right. *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734. The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by

-8-

counsel.  *See Cowart*, 662 F.2d at 735 - 36.  However, where an unrepresented claimant has not

waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to

a special duty.  *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v.*

*Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special duty requires the ALJ to

"scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and

to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances

are elicited."  *Cowart*, 662 F.2d at 735 (citations omitted).

### C.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's

medical sources do not give sufficient medical evidence about an impairment to determine

whether the claimant is disabled.  20 C.F.R. § 416.917; *see also Conley v. Bowmen*, 781 F.2d 143,

146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required

to order a consultative examination unless the record establishes that such an examination is

necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206,

1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order

such an evaluation may be reversible error).  Under the regulations, however, the ALJ may

determine that a consultative examination or other medical tests are necessary.  20 C.F.R. §

416.917 (1998).

### D.    The Five Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§

404.1520,  416.920.  First, if a claimant is working at a substantial gainful activity, she is not

disabled.  20 C.F.R. § 404.1520 (b).  Second, if a claimant does not have any impairment or

combination of impairments which significantly limit his or her physical or mental ability to do

basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. §

404.1520 (c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520 (d).  Fourth, if a

claimant's impairments do not prevent him or her from doing past relevant work, she is not

disabled.  20 C.F.R. § 404.1520 (e).  Fifth, if a claimant's impairments (considering his or her

residual functional capacity, age, education, and past work) prevent him or her from doing other

work that exists in the national economy, then claimant is disabled.  20 C.F.R. § 404.1520 (f).

     In determining whether a claimant's physical and mental impairments are sufficiently

severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must

consider any medically severe combination of impairments throughout the disability determination

process.  42 U.S.C. § 423 (d)(2)(B).  The ALJ must evaluate a disability claimant as a whole

person, and not in the abstract as having several hypothetical and isolated illnesses.  *Davis v.*

*Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make specific and well-

articulated findings as to the effect of a combination of impairments when determining whether an

individual is disabled.  *See id.*, 985 F.2d at 534.

     The claimant has the burden of proving the existence of a disability as defined by the

Social Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  The claimant must

prove disability on or before the last day of his or  her insured status for the purposes of disability

benefits.  *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d

-10-

1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416 (i)(3); 423(a), (c). If a claimant becomes disabled

after the claimant has lost insured status, his or her claim for disability benefits must be denied

despite the disability. *See, e. g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v.*

*Califano*, 574 F.2d 274 (5th Cir. 1978).

E.      __The Evaluation of Mental Disorders__

The evaluation of disability on the basis of mental disorders requires the documentation of

a medically determinable impairment, as well as consideration of the degree of limitation such

impairment may impose on the individual's ability to work. The listings for mental disorders are

arranged in nine diagnostic categories. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The criteria in

paragraphs B and C of the listings for mental disorders describe those functional limitations

associated with mental disorders which are incompatible with the ability to work — i.e.

limitations in functional areas deemed essential to work. A mental impairment is medically

equivalent to a listed mental impairment if the medical findings are at least equal in severity and

duration to the listed findings. 20 C.F.R. § 404.1526. An individual meeting or equaling the

criteria could not reasonably be expected to engage in gainful work activity. 20 C.F.R. Pt. 404,

Subpt. P, App. 1.

Individuals who have an impairment with a level of severity which does not meet the

criteria of the listings for mental disorders may or may not have the residual functional capacity

["RFC"] which would enable them to engage in substantial gainful work activity. The

determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in

-11-

substantial gainful work activity when the criteria of the listings for mental disorders are not met

or equaled, but the impairment is nevertheless severe.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by

the impairment.  Functional limitations are assessed using the criteria in paragraph B of the listings

for mental disorders (activities of daily living; social functioning;  concentration, persistence, or

pace;  and ability to tolerate increased mental demands associated with competitive work).  A

"marked" degree of limitation means more than moderate, but less than extreme.  A marked

limitation may arise when several activities or functions are impaired or even when only one is

impaired, so long as the degree of limitation is such as to seriously interfere with the ability to

function independently, appropriately and effectively.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The

Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all

evidence needed to evaluate mental impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The

technique is used in connection with the sequential evaluation process.  *See* 20 C.F.R. §§

404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports

from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals

and clinics.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Information from both medical and non-medical

sources may be used to obtain detailed descriptions of the individual's activities of daily living;

social functioning;  concentration, persistence and pace;  or ability to tolerate increased mental

demands (stress).  This information can be provided by programs such as community mental

health centers, day care centers, and family members who have knowledge of the individual's

functioning.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports.  It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerably over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor.  Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Some individuals may actually have worked during the period of time pertinent to the determination of disability.  Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Individuals with chronic psychotic

disorders commonly have their lives structured in such a way as to minimize stress and reduce

their signs and symptoms.  Such individuals may be much more impaired for work than their signs

and symptoms would indicate.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The results of a single

examination may not adequately describe these individuals' sustained ability to function.  It is,

therefore, vital to review all pertinent information relative to the individual's condition, especially

at times of increased stress.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  It is mandatory to attempt to

obtain adequate descriptive information from all sources which have treated the individual either

currently, or in the time period relevant to the decision.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms

and ability to function.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  While psychotropic medications may

control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment

may or may not affect the functional limitations imposed by the mental disorder.  20 C.F.R. Pt.

404, Subpt. P, App. 1.  In cases where overt symptomatology is attenuated by the psychotropic

medications, particular attention must be focused on the functional restrictions which may persist.

These functional restrictions are also to be used as the measure of impairment severity.  20 C.F.R.

Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to

temporary remission.  In assessing whether medical improvement has occurred in persons with this

type of impairment, the ALJ will consider the longitudinal history of the impairments, including

the occurrence of prior remission, and prospects for future worsening.  Improvement in such

-14-

impairments that is only temporary will not warrant a finding of medical improvement.  20 C.F.R. § 404.1594 (iv).

**F.    <u>Other Work</u>**

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"].  *Foote,* 67 F.3d at 1558.  Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills."  *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987).  In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert.  *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-

exertional limitations are alleged, the preferred method of demonstrating that the claimant can

perform specific work is through the testimony of a vocational expert).  It is only when the

claimant can clearly do unlimited types of work at a given residual functional level that it is

unnecessary to call a vocational expert to establish whether the claimant can perform work which

exists in the national economy.  *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989);

*Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a

specific finding as to whether the non-exertional limitations are severe enough to preclude a wide

range of employment at the given work capacity level indicated by the exertional limitations.

*Foote*, 67 F.3d at 1559.

### 1.    <u>Pain</u>

Pain is a non-exertional impairment.  *Foote*, 67 F.3d at 1559; 826 F.2d at 1003.  Congress

has determined that a claimant will not be considered disabled unless he furnishes medical and

other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical

impairment which could reasonably be expected to produce the pain or symptoms alleged.  42

U.S.C. § 423 (d)(5)(A).  The ALJ must consider all of a claimant's statements about his

symptoms, including pain, and determine the extent to which the symptoms can reasonably be

accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1529.  In

determining whether the medical signs and laboratory findings show medical impairments which

reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh

Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and
> either (2) objective medical evidence that confirms the severity of the alleged pain

arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423 (d)(5)(A).

### 2.    Credibility

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Foote,* 67 F.3d at 1561-62*; Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such

testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

## V.    APPLICATION AND ANALYSIS

### A.    The Facts

#### 1.    Before Alleged Onset Date

On September 30, 1999, Howell complained of dizziness to Mark E. Weigley, M.D., saying that the for the past three days he felt like the room was spinning.  Howell reported another episode of dizziness had occurred three months earlier.  The impression was recurring labyrinthitis[2], hyperlipidemia, and rule out vascular disorder.  R. 119.

On November 4, 1999, Howell reported continued vertigo and spinning sensations to Dr. Weigley.  The diagnosis was diabetes partial control and vertigo.  R. 117.  Dr. Weigley noted Howell complained of lightheadedness and vertigo on April 12, 2000.  The diagnosis was diabetes type II poor control, hyperlipidemia, hypertension and vertigo.  R. 114.

Howell returned to Dr. Weigley on May 12, 2000, reporting that his dizziness was worse.  The impression was vertigo, diabetes poorly controlled, hypertension and hyperlipidemia.  R. 112.  On September 15, 2000, Howell reported that the vestibular rehabilitation had made him feel "lousy."  His hypertension was under poor control.  The diagnosis remained unchanged.  R. 109.

---

[2]Inflammation of the labyrinth (the inner ear), sometimes accompanied by vertigo and deafness. STEDMAN'S MEDICAL DICTIONARY 928 (26th ed. 1995) [hereinafter "STEDMAN'S"].

On December 20, 2000, Dr. Weigley evaluated Howell for frequent nausea and dizziness.

Howell's dizziness had improved somewhat after the vestibular rehabilitation but still persisted.

The impression remained the same.  R. 107.  On January 19, 2001 Howell reported to Dr. Weigley

that his lightheadedness and dizziness continued.  The impression was diabetes mellitus out of

control, hyperlipidemia poor control and hypertension under fairly good control.  R. 106.

       2.      After Alleged Onset Date

On April 13, 2001,[3] Howell complained to Dr. Weigley of waves of dizziness associated

with nausea and a spinning sensation that came unexpectedly without activity, saying he had

experienced both over the past few years.  R. 105.  Examination revealed exogenous obesity and

elevated blood pressure.  The impression was hyperlipidemia, diabetes, hypertension and recurring

dizziness.  R. 105.  On June 19, 2001, Howell requested a replacement for the Tiazac he had been

prescribed due to his feeling very ill, dizzy and nauseated after taking it twice.  R. 102.

Howell returned to Dr. Weigley on September 28, 2001.  He had daily nausea and

lightheadedness that seemed worse in the evening.  Howell took all his medication in the evenings

with meals but woke every morning feeling nauseated.  Howell had lost his job and was

unemployed.  Dr. Weigley suggested Howell's nausea may have been due to Glucovance and

recommended he discontinue it for a few days to see if that would end the nausea.  R. 99.  Howell

called Dr. Weigley on October 3, 2001 and reported that he felt worse when he discontinued the

---

[3]Howell alleged onset as of March 1, 2001, R. 12, and engaged in no substantial gainful activity after that date, R. 15, Finding 1.

Glucovance.  He resumed taking the medication.  R. 101.  Robert Rodgers, M.D. noted on

February 5, 2002 that Howell had chronic vertigo, hypertension and diabetes mellitus.  R. 175.

     3.     After Disability Date Determined by ALJ

At the request of DDS, a consultative exam was performed on Howell by Alvan Barber,

M.D. on February 8, 2002.  R. 152.  Howell had present symptoms of daily vertigo, dizziness and

nausea.  R. 152.  He had a history of hip pain when standing greater than 20 minutes.  R. 152.  He

had blurred vision, headaches, muscle and joint pain.  R. 153.  The impression was diabetes

mellitus, hypertension and vertigo by history.  R. 154.  The doctor opined that Howell could walk

and sit for a reasonable period of time.  R. 155.  He had problems with long periods of standing

and could not lift or carry heavy objects.  R. 155.  Dr. Barber noted that Howell's symptoms were

possibly perpetuated by his obesity.  R. 155.  Howell was limited to activities and occupations not

requiring long periods of standing.  R. 155.

At the request of DDS, M. delaCerna, M.D. completed a Physical Residual Functional

Capacity ("RFC") assessment on Howell on February 16, 2002.  Because of Howell's vertigo, he

was to avoid all exposure to hazards.  R. 162.  Dr. delaCerna did not find anything that he believed

would severely limit Howell's walking or lifting.  R. 164.  Although he had never met Howell, Dr.

delaCerna described him as "not fully credible."  R. 164.

On February 19, 2002, Dr. Weigley wrote a letter to DDS, noting that he had been

Howell's primary care physician for the past three years.  Dr. Weigley stated that Howell "suffers

from chronic recurring episodes of nausea and dizziness consistent with Meniere's disease

exacerbated by medications for his several chronic medical condition of diabetes mellitus,

-20-

hyperlipidemia and hypertension." Dr. Weigley added that Howell's disturbances of balance were characterized by "loss of position sense and a sensation of dizziness" as well as paroxysmal attacks associated with nausea, ataxia and incapacitation. Dr. Weigley also noted that an electronystagmography completed May 5, 2000 indicated vestibular pathology, and that he had tried numerous medication therapies and regimens for the vertigo, but that they had either not worked or had produced untoward side effects that prevented him from gainful employment. R. 97.

On March 12, 2002, Dr. Rodgers noted Howell still had vertigo and chronic nausea. The diagnosis was hypertension, panic attacks, gastroesophageal reflux disease, and diabetes mellitus. R. 171. Dr. Rodgers noted that Howell's dizziness continued on April 23, 2002. The impression was chronic vertigo unchanged, hypertension, gastroesophageal reflux disease, and diabetes. R. 209. In response to a DDS request, Dr. Rodgers opined on May 21, 2002 and June 18, 2002 that Howell suffered from a mental impairment that significantly interfered with his daily functioning. R. 166 - 67.

Another RFC was completed on Howell at the request of DDS on May 24, 2002.[4] Howell was limited to only occasionally climbing ramps, stairs, ladders, ropes and scaffolds. R. 183. Howell was to avoid all exposure to hazards. R. 185.

Cydney Yerushalmi, Ed.D. completed a psychological consultative exam on Howell on August 3, 2002. She noted his problems were mainly physical and resulted from vertigo. He had

_____

[4]The printed name and signature of the consultant who completed the RFC are illegible. R. 188.

some anxiety over the unknown etiology of his symptoms.  The diagnosis was adjustment disorder

with anxiety, diabetes, vertigo, high blood pressure and obesity.  R. 189 - 91

A Psychiatric Review Technique Form was completed on Howell by May Tay, Ph.D., on

August 13, 2002.  R. 192.  Howell was diagnosed with adjustment disorder with anxiety.  R. 195.

Dr. Tay found Howell had mild restrictions on activities of daily living.  R. 202.

### B.    The Analysis

Howell's primary argument is that the ALJ erred by finding that he could have returned to

his past relevant work up until February 8, 2002 and was not disabled prior to that date.  Docket 14

at 6.  More specifically, Howell takes issue with the ALJ's contention, R. 14, that his blood

pressure, diabetes mellitus, and vertigo were "controlled by changing medication and by vestibular

rehabilitation" prior to that date.  Docket 14 at 6.  Howell argues that the medical evidence

contradicts this allegation.  After a review of the medical record, and of Howell's testimony, the

Court agrees with Howell.

Severe dizziness and related nausea are the conditions that prevented Howell from

continuing his prior work.  The record contains many examples of Howell's dizziness and nausea,

both prior to and after his alleged onset date of March 1, 2001.  For example, on an April 13, 2001

office visit to Dr. Weigley, Howell described "waves of dizziness" that were associated with

"nausea and a spinning sensation that come unexpectedly without activity over the past few years."

He experienced some relief with Lorazepam.  R. 105.  Dr. Weigley thought that this recurring

dizziness was serious enough to warrant further investigation, and ordered an MRI of Howell's

auditory canals.  R. 105.  On May 11, 2001, Howell complained to Dr. Weigley of dizziness, and

sought different blood pressure medications to see if they were the underlying cause.   R. 103.

Howell also occasionally felt anxious.  R. 103.  Dr. Weigley's impression of Howell's condition

included dizziness, hypertension, and diabetes mellitus.  R. 103.  On a September 28, 2001 office

visit to Dr. Weigley, Howell complained of "daily nausea and lightheadedness", and Dr. Weigley

noted that Howell was suffering "nausea secondary to Glucovance" and had a history of vertigo.

R. 99.   The medical record simply does not support the ALJ's contention that Howell's nausea

and dizziness were under control prior to February 8, 2002.

Howell contends that Dr. Weigley's letter to DDS dated February 19, 2002, supports his

contention that he suffered chronic nausea and dizziness between March 1, 2001 and February 8,

2002.  Docket 14 at 7 - 8.  Howell contends that Dr. Weigley "clearly indicated that Plaintiff's

illness had occurred *at least three years* prior to February 19, 2002 and had not improved despite

numerous medication therapies."  Docket 14 at 8 (emphasis added).  The Commissioner is correct

that Howell has overstated the contents of the letter.  Dr. Weigley indicates in the letter that he has

been Howell's primary care physician for three years, but does not explicitly claim that Howell has

been disabled for three years. Indeed, such a claim would conflict with Howell's contention that he

did not become disabled until March 1, 2001 — less than a year before Dr. Weigley wrote the

letter.

Nevertheless, the letter does offer some support for Howell's claimed onset date.  In the

letter, Dr. Weigley does not offer a particular date upon which Howell became unable to work.

Nevertheless, the clear implication of Dr. Weigley's statement that Howell "has tried numerous

medication therapies and regimens for his recurring vertigo, however, they have not worked or

-23-

have produced untoward side effects preventing him from continuing gainful employment" is that Howell had suffered significant, debilitating nausea for an extended period — not merely the 11 day span between Dr. Weigley's letter and the onset date as determined by the ALJ. The medical record amply demonstrates months of such unsuccessful therapies and regimens dating back to a period well before Howell's alleged onset date of March 1, 2001. R. 112, 109, 107, 106.

Finally, Howell's own testimony — which the ALJ does not discredit[5] — was that he suffered debilitating dizziness and nausea prior to his alleged onset date of March 1, 2001. According to Howell, his vertigo started well prior to that date, and eventually worsened to the point where it caused him to miss numerous days of work. R. 222. After using up all of his annual leave and sick leave because of the vertigo, he was terminated. R. 222. Despite months of tests and therapy, his vertigo continued.[6] R. 223 - 24.

The ALJ mentioned two reasons for selecting the onset date of February 8, 2002 and rejecting March 1, 2001: 1.) his conclusion that Howell's vertigo was controlled prior to February 8, 2002; and 2.) a medical record allegedly showing that "[t]here was only a history of vertigo noted through September 28, 2001." R. 14. The first statement is not supported by substantial evidence as is apparent from the evidence of uncontrolled vertigo prior to February 8, 2002. The second reason, which implies that Howell's vertigo was under control as of September 28, 2001 is

---

[5]The ALJ found that Howell's testimony "was essentially credible as to his current functional limitations." R. 15, Finding 4. The ALJ made no other finding regarding Howell's credibility.

[6]According to his testimony, Howell later developed a different form of vertigo — called "positional vertigo" — that affected him when he would tilt his head certain ways or adopt certain postures. R. 223. Although therapy eventually greatly reduced his positional vertigo, Howell testified that he never obtained relief from the original type of vertigo he suffered. R. 224.

-24-

contradicted by the medical record cited to by the ALJ, which shows that Howell was Dr. Weigley on September 28, 2001 to complain of "[n]ausea and dizziness." R. 99.  The implication that Howell's vertigo was under control as of September 28, 2001 is also contradicted by the medical record, Dr. Weigley's letter, and Howell's own testimony.

Thus, substantial evidence does not support the ALJ's conclusion that Howell suffered no debilitating vertigo prior to February 8, 2002.  Rather, substantial evidence suggests just the opposite.  Moreover, the ALJ implicitly and without explanation rejected Howell's testimony regarding the persistence and severity of his vertigo.  A failure to articulate the reasons for discrediting subjective testimony requires that the testimony be accepted as true.  The resolution of his first argument in Howell's favor renders consideration of his other two arguments unnecessary.

## VI. <u>CONCLUSION</u>

For the reasons stated above, the decision of the Commissioner is **REMANDED** to the Commissioner of Social Security under Sentence Four of 42 U.S.C. § 405 (g) for the payment of benefits.  The Commissioner has already considered the essential evidence as to date of onset, and it is clear that the cumulative effect of the evidence establishes disability from March 1, 2001 without any doubt.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984); *see also Spencer v. Heckler*, 765 F.2d 1090,

1094 (11th Cir. 1985). The Clerk shall enter a judgment and close the case.

      **DONE AND ORDERED** this 17th day of August, 2005.

                          JAMES G. GLAZEBROOK
                      UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia      30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL        33602

The Honorable David Danziger
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL        32817